NOT DESIGNATED FOR PUBLICATION

No. 113,661

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of N.P.
Year of Birth 2010, a Female.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Opinion filed December 23, 2015. Affirmed.

*Judy Fowler*, of Wichita, for appellant, natural mother.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before HILL, P.J., PIERRON and POWELL, JJ.

*Per Curiam*: C.P. is the natural mother of N.P. who was born in 2010. In January 2015, the district court found clear and convincing evidence that Mother was unfit to parent N.P. and the conduct or condition was unlikely to change in the foreseeable future. The court terminated Mother's parental rights. On appeal, Mother contends the court should have given her more time to demonstrate she could become fit within the foreseeable future and terminating her parental rights was not in the best interests of N.P. We affirm.

In December 2012, N.P. was staying with her father, R.H., her stepmother, H.H., and her half-sibling, B.H. Mother and Father had agreed to equal custody of N.P., although Mother could not recall at the time how often N.P. was actually in her care. Both Mother and Father later testified Mother had N.P. approximately 50 percent of the time. The Kansas Department for Children and Families (DCF) had received a report

1

regarding possible neglect of B.H. on November 27, 2012. DCF determined B.H. and N.P. should be placed in custody as children in need of care (CINC). Before filing, however, police responded to Father's home because B.H. was not breathing. B.H. was later pronounced dead at Wesley Medical Center. On December 4, 2012, N.P. entered protective police custody due to a dangerous situation/child death. An autopsy later determined B.H. had died of Sudden Infant Death Syndrome. On December 6, 2012, the State filed a child in need of care (CINC) petition on behalf of N.P. On December 7, 2012, the district court ordered N.P. placed in the temporary custody of DCF. The court adjudicated N.P. a CINC as to Mother on January 17, 2013, and a CINC as to Father on February 11, 2013.

Jerry Pierce was the case manager assigned to N.P.'s case on December 6, 2012. He worked with the family until June 28, 2013. Pierce testified that on March 28, 2013, N.P. reintegrated with Father despite a number of concerns on the part of Pierce, including Father's source of income and his continued drug use. While Mother had no concerns about Father's ability to parent N.P., she too had concerns about his drug use and knew Father had been on methadone since 2008. Pierce testified, however, that N.P. appeared happy during the period of reintegration and Father met minimal parenting standards.

During the period of reintegration in Father's home, Mother went 4 or 5 months without seeing N.P. Pierce also lost contact with Mother during May. Mother testified that it was a mistake to not have contact with N.P. for that period of time because she knew it hurt N.P. She testified she would never do it again.

Mother stated one reason for her absence was Father had insisted all visits with N.P. take place in his home, and Mother was not comfortable with this condition. Pierce noted in a court report, though, that in order for Mother to continue unsupervised visits with N.P., the visits had to take place in Father's home or in the community because

2

Mother did not have a stable and safe home for N.P. to visit. Pierce testified that at the beginning of the case, Mother was living with her fiancé and other individuals willing to complete court orders. In February or March, she moved in with a friend. In March, she moved into her own home. In May, Father reported Mother had moved again, but Mother was not in contact with Pierce, and in June, Mother reported she was living with a boyfriend. Pierce testified that he had spoken with Mother about housing services and gave her a guide with related information.

During this period of reintegration, Father was involved in two domestic violence incidents. On April 18, 2013, Father was arrested for a domestic battery incident involving H.H. at his home. Father reported to Pierce that N.P. was present during the incident but later testified at the termination hearing that she was not. On September 7, 2013, Father was also involved in an incident with H.H.'s then-boyfriend outside Father's home. N.P. was present during that incident.

Father also had a history of domestic violence. Five protective orders had been taken out against Father since 2004. Father had pled guilty to one charge of domestic battery and had been convicted of interfering with phone service and domestic violence, all in 2004. Mother had also filed a Protection from Abuse (PFA) petition against Father. Mother testified at trial that someone had advised her to file the PFA to gain custody of N.P. and that was her sole reason for doing so. Father testified that he believed Mother had been manipulated into filing the PFA against him.

Sylvia Brown, a reintegration social worker with Saint Francis Community Services (St. Francis), testified that on July 1, 2013, DCF changed contractors from United Methodist Youthville to St. Francis. At that time, employees assumed new job duties and caseloads. Brown took over N.P.'s case along with approximately seven other new cases. She began working with Father immediately but did not have any current

contact information for Mother. She attempted to contact Mother by phone on July 9 but was unsuccessful.

Sakia Gourley, an aftercare worker with St. Francis, testified she was assigned to N.P.'s case in July or August 2013. She attempted to visit Father's home weekly, but he was often unavailable. Father's home was clean and well-kept on the first few visits, but later dishes began piling up and food was left on tables. N.P. was clean. Gourley testified that Father was asked to complete drug testing during the reintegration period, but he usually did not comply.

On September 12, 2013, Brown and Gourley conducted a visit at Father's home. Brown observed that the home was a little unkempt, and N.P. had food on her face. Gourley testified the kitchen was a mess, the screen in the kitchen window had been slashed open, fish had died in the fish tank, and the floor was not vacuumed. During the visit, Hayesville law enforcement officers showed up for a welfare check in response to reports that the utilities had been turned off and that H.H. had been seen at the home with a child. Due to the prior domestic violence incident, H.H. was not supposed to be in Father's home.

The officers asked Brown and Gourley to conduct a walk-through of the home and Father allowed it. During the walk-through, Brown noticed women's shoes on the floor and makeup on the bathroom counter, but H.H. was not in the home. She also noticed hair dye, which she believed indicated that Father might be attempting to alter the results of a hair follicle drug test. Brown noted the bathroom mirror had a bullet hole of unknown origin, and an unloaded rifle was found in an unlocked laundry room. N.P. was placed in respite care due to safety concerns. After Father's hair follicle test results came back and he admitted he "messed up," N.P. was moved from respite care to an out-of-home placement.

4

After N.P. was removed from Father's home in September, Brown made several more attempts to contact Mother. Brown testified she was able to establish contact with Mother within a few days, and Mother had been in constant contact ever since. Mother began weekly visits with N.P. on September 20, 2013. Her visits were originally supervised at St. Francis but transitioned to unsupervised. According to Brown, Mother's unsupervised visits took place in the community because Mother did not have a stable home where the visits could take place. At the time, Mother was living with a boyfriend who occasionally used marijuana and who did not want to submit to drug tests or refrain from using alcohol.

Brown testified Mother's housing had been a continuing concern since September 2013, and she identified it as one of the barriers to N.P.'s reintegration with Mother. According to Brown, Mother had claimed at least five residences during the pendency of the case. In addition to her residences prior to June 2013, Mother had also lived with her sister in Wichita, and she moved to Oklahoma City, Oklahoma, to live with her father. At the time of the hearing, Mother was living with a friend in Wichita. To Brown's knowledge, the longest period of time Mother had spent in any one residence was several months. Brown testified she felt Mother would need to be in a single residence for 6 months before it could be considered stable housing. To assist Mother in finding suitable housing, Brown provided her with a list of affordable housing, offered to take Mother to places she had chosen, and encouraged Mother to apply for Section 8 housing. She also submitted a request through the Interstate Compact on the Placement of Children (ICPC) for Mother so N.P. could be reintegrated with Mother in Oklahoma. The request was denied.

Brown testified stable income was another barrier to N.P.'s reintegration with Mother. Brown believed Mother had had four or five jobs over the course of the case. The jobs were temporary and did not provide sufficient income to meet N.P.'s needs. To Brown's knowledge, the longest Mother had worked in one place was 2 to 3 months.

5

Brown felt Mother needed to be employed at the same job for 6 months before it could be considered stable employment. Brown had encouraged Mother to apply for a position at Wright Business College, but Mother did not do so.

Brown believed the final barrier to N.P.'s reintegration with Mother was her inability to protect N.P. from Father, particularly regarding his history of domestic violence.

Brown testified that Mother had completed all court orders initially given to her, and Mother had not received any additional court orders during the pendency of the case. These court orders included: a clinical assessment completed on March 1, 2013; a domestic violence class completed on March 13, 2013; a budget and nutrition class completed on May 1, 2013; parenting classes completed on January 16, 2013; and all requested urinalysis and hair follicle tests, with negative results.

In Brown's opinion, Mother would need to show 6 months of stability before N.P. could be reintegrated. Due to N.P.'s age and the length of time she had already been in DCF custody, however, further delay in achieving permanency could affect N.P. developmentally. Brown testified permanency for a child meant being placed in a stable environment that was able to provide for the physical, medical, and emotional needs of the child over his or her lifespan. Brown did not recommend reintegration with Mother at the time of the hearing because Mother had not demonstrated she could provide a stable home or meet N.P.'s financial needs. She acknowledged that Mother and N.P. had a strong bond, and N.P. could be traumatized by termination of Mother's parental rights. Brown recommended, however, that Mother's parental rights be terminated.

Johnathan Manning, a St. Francis reintegration family support worker, began supervising Mother's visits with N.P. in September 2013. Manning testified that Mother was affectionate and appropriate during her visits, and she appeared to have a good bond

with N.P. Mother brought food and age-appropriate gifts to all visits. N.P. was always happy to see Mother during the visits Manning supervised. In May 2014, Mother's status changed to unsupervised visits. Manning testified he had no safety concerns during Mother's unsupervised visits. Mother only missed two visits during the period in which he had the case, and she notified Manning prior to missing the visits.

Rebecca Williams, N.P.'s foster mother, testified that in September 2013, N.P. was placed with the Williams family and remained there for the 15 months leading up to the termination hearing. Over the first few months, N.P. would sporadically wet her pants an hour or two after her weekly visits with Mother and Father (which occurred consecutively on the same day), and that was the only time it happened. N.P. went to a number of medical and diagnostic appointments during her time in foster care. N.P.'s physical and eye exams were fine, but she had nine cavities which required sedation to be corrected.

At the time of the hearing, N.P. had already been diagnosed with a high severe speech delay and was waiting on an appointment with a pediatric developmental specialist regarding a possible gross motor delay. N.P. was also delayed academically. She could not identify letters, did not know colors when she was first placed in foster care, and had difficulty with shapes. She had attended a special needs preschool 4 days a week since February 2014 and was unable to complete the morning and afternoon routines unassisted. She also received speech therapy three times a week.

According to Williams, N.P. loved her parents and became upset when she did not know where they were. She also occasionally destroyed things after visits with them, such as her hair bows. N.P. would look at pictures of her foster family and ask where she was and would also shred pictures of her foster family. Williams testified that while N.P. loved her Mother and Father, Williams' opinion was that N.P. "need[ed] for this to be over."

Amy Meek, a clinical therapist, testified she began seeing N.P. in individual therapy sessions on November 20, 2013. N.P.'s paternal grandmother attended some of the sessions to assist with N.P.'s adjustment between the grandmother's home and the foster home because N.P. tended to show regressive behavior after visits with her grandmother. Meek told the district court N.P. initially presented with significant anxiety and hypervigilance, appeared delayed, and possessed poor social skills and poor self-regulation. N.P. did not show age-appropriate social skills and interaction, verbalization and language development, or attachment skills and interaction.

Meek also testified she observed themes of trauma in her sessions with N.P. According to Meek, N.P. pretended to smother babies during therapy. Meek knew N.P. was in the home when B.H. died of SIDS and that N.P.'s foster family had six children of their own, including a new baby. Meek acknowledged the death of B.H. could have caused some of N.P.'s trauma or anxiety but this had not caused all of her issues. In Meek's opinion, N.P.'s trauma had been caused by several factors: being removed from the home, observing fighting and conflict in the home, and observing other unknown trauma.

Meek had observed that N.P. would not cross certain "midpoints" in her body, which indicated to Meek N.P. had experienced a high degree of trauma over an extended period of time. Meek explained that people have certain midpoints in their bodies–one down the middle of the body, one under the neck, and one under the chest. When a person has appropriate attachment and has not experienced trauma, they are able to perform actions which cross these midpoints, such as reaching for an object across the front of the body. Meek testified N.P. would twist or perform more difficult actions rather than reach across her midpoints.

Meek diagnosed N.P. with Post-Traumatic Stress Disorder (PTSD) and established treatment goals to address attachment, anxiety, and trauma issues. According to Meek's testimony, N.P. had shown progress over the course of 20 individual therapy sessions, becoming more expressive and age-appropriate but she continued to need a lot of support. N.P. would need ongoing therapy, developmental help and structure, plus a caregiver who could provide these things for her. In Meek's opinion, permanency was very important to N.P. because each time she experienced a change in caregiver, she would regress developmentally. Meek told the court that a child of N.P.'s age needs to attach to a primary caregiver for self-image and ability to self-regulate. Meek also testified N.P. would need permanency within the next couple of months due to her age, the length of time she had already been out of the home, and because she had been out of the home before.

Jeanine Jantz, a licensed clinical professional counselor, testified she had provided family therapy for Mother and N.P. beginning in April 2014. She met with Mother and N.P. for a total of 19 sessions plus their intake. Mother missed three sessions due to transportation issues and had one no-show due to a psychological evaluation running late. For a period of time, Mother was living in Oklahoma City and would return to Wichita to attend family therapy sessions. Jantz diagnosed N.P. with adjustment disorder with mixed emotions of conduct. According to Jantz, N.P. had difficulty regulating her emotions and behaviors after visits with her mother, and she had more difficulty adjusting to changes in situations than a child of her age should. Jantz's goals for therapy were to help Mother strengthen her ability to nurture, provide structure for, and engage with N.P. These goals were developed in session with the family. According to Jantz, Mother had made a great deal of effort in family therapy with N.P. Mother's bond with N.P. had not been particularly strong when therapy began but had grown much stronger and healthier.

Jantz testified that consistency and stability were very important with N.P.'s diagnosis, and their absence could negatively impact her mental health. Jantz also told the

9

court that a child needs permanency in a child's time frame. In her opinion, a parent spending 3 to 6 months in a single residence would indicate the ability to provide care in the longer term. In this case, N.P. had already been out of her home for almost half of her life, and she was beginning to develop attachments to other caregivers and things. According to Jantz, waiting for a parent to become stable might not necessarily be in N.P.'s best interests. Jantz did not feel, however, that she had sufficient information to make a professional recommendation as to N.P.'s best interests.

Mother testified that at the time of the trial in December she was living with a friend in Wichita. She had been living there since the beginning of November. She recently started working for a temporary service that remodeled Dillons stores and Kwik Shops and viewed the job as long-term. The job required some travel and working overnights. She had worked 21 hours the previous week but was unsure what her hours would be going forward. She was earning $10.50 an hour. Mother was planning on getting her own apartment once she got her first paycheck. She had talked with Father about the apartment complex he lived in and was planning to move there.

Mother testified she had not bought groceries since returning to Kansas. She did not have a car or a driver's license but used bus transportation. She had no money in a savings account but believed she would make enough at her current job to pay for rent, utilities, and groceries.

Mother told the court that prior to returning to Kansas, she had worked as a housekeeper for the elderly and disabled from August until November 2014. She had also worked for Walmart through a temporary service for a couple of months in 2014. She was unemployed from May 2013 until March 2014—the longest period of unemployment in her life. She had worked at Dillons for 8 months, from October 2012 to May 2013. This was her longest period of employment. Mother also testified that since the beginning

of the case, she had used Workforce to apply for a lot of jobs but had been unable to find one.

Mother testified that her longest period of stable housing was 2 months in the beginning of 2013 when she was living on her own. She had to move because she could not afford it despite having a job. She also testified that St. Francis had given her an application for Section 8 housing which she had turned in. She did not make it to the interview to see if she was approved because she was living in Oklahoma City by that time and could not afford the trip back to Wichita. Mother had moved to Oklahoma City to live with her father and his roommate. She wanted to get support from her father to get back on her feet, and she was hoping to reintegrate N.P. into her home in Oklahoma. When she found out she would not be able to reintegrate with N.P. in Oklahoma, she returned to Kansas to improve her chances of reintegrating with N.P.

Mother had attended special education classes until she graduated from high school. She had also taken speech therapy. Mother had seizures as a child, but they had stopped at age 16. She had been on disability until age 18 but did not believe she was currently eligible to receive disability.

Mother testified that a good mother should be stable, which included having a house and a job. According to Mother, a person should have a house for 6 months in order to be considered stable. She also said a good mother should care for her child. This entailed taking her child to appointments and providing her with clothes and food. Mother added she had purchased clothes for N.P. when she had money but had been to only one of N.P.'s medical appointments since the beginning of the case and had been unable to provide groceries. As far as she was aware, the only reason N.P. was in state custody was because N.P.'s half-sibling had died.

11

As part of the case, Mother completed a clinical assessment, but she was unsure what the recommendation was from the assessment. She also attended individual therapy under court order and was successfully discharged. She testified St. Francis mentioned she should return to individual therapy but she did not agree. Mother had discussed resuming individual therapy with her therapist, but the only available time to schedule appointments would have conflicted with Mother's family therapy sessions.

Mother also completed a psychological evaluation at Wichita State University. As part of this evaluation, Mother completed two multiple choice tests and participated in an interview. According to Lindsey Bupp, a PhD student and the evaluator of the test, the tests were designed to indicate if an individual was underreporting or overreporting. Mother's test indicated she was underreporting by "denying common faults and claiming moral excellence." Thus, her evaluation was invalid.

The district court held a termination hearing over several days in December 2014. The court issued its ruling terminating Mother's parental rights on January 5, 2015. Mother appeals.

When reviewing a district court's findings on unfitness, we must "consider whether, after review of all the evidence, viewed in the light most favorable to the State, [we are] convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence," that the parent was unfit and was unlikely to become fit in the foreseeable future. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). In making this determination, appellate courts do "not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." 286 Kan. at 705.

The Revised Kansas Code for Care of Children lists a number of nonexclusive factors the court must consider in determining a parent's unfitness. K.S.A. 2014 Supp. 38-

2269(b). Any one of the factors may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2014 Supp. 38-2269(f).

In the present case, the district court relied on four factors in determining Mother's unfitness:

- K.S.A. 2014 Supp. 38-2269(b)(3)—the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental, or emotional needs of the child (Mother's failure to protect N.P. from Father's substance abuse issues);
- K.S.A. 2014 Supp. 38-2269(b)(4)—physical, mental, or emotional abuse or neglect or sexual abuse of a child (Mother's failure to provide a safe and stable living environment for N.P. and allowing N.P. to live with Father despite his methadone use);
- K.S.A. 2014 Supp. 38-2269(b)(7)—failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family;
- K.S.A. 2014 Supp. 38-2269(b)(8)—lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child.

*Present Unfitness*

Mother concedes she was unfit at the time of the hearing but argues the only factor making her unfit was the absence of appropriate stable housing. Mother does not explicitly address which of the above four factors she is discussing in her argument. Her discussion appears to generally address all the factors, though, because stable housing appears pertinent to all four.

At the time of the hearing, Mother did have employment which she believed would be long term and would provide sufficient income to provide for her and N.P. She was not working full-time, however. She had not been paid and was unsure of her hours

13

going forward. She had also not bought groceries since returning to Kansas and had no savings to tide her over until her first paycheck. Additionally, Mother also had plans to move into the same apartment complex as Father. Mother's condition at the time of the trial demonstrated not only a lack of stable housing but financial instability as well as a continuing unwillingness to shield N.P. from Father's substance abuse.

The record also suggests Mother may have had underlying mental health issues which contributed to her inability to maintain stable housing and employment. Bupp noted that during the psychological evaluation, Mother made a number of statements that indicated she was "overly reliant on others, passive, [and] codependent." This assessment is supported by Mother's pattern of relying on family, friends, and significant others to provide housing and financial support during the pendency of the case. When Bupp suggested during the evaluation that perhaps Mother was expected to have a full-time job and independent housing, Mother responded, "I just don't get it. Both my parents have disability checks. They have more than enough and they pay for my rent." The record does not suggest Mother had resolved or significantly improved these issues prior to the termination hearing.

Viewing these facts in the light most favorable to the State, a rational factfinder could have found it highly probable that Mother was unfit due not only to her lack of stable housing, but also her lack of stable employment and codependency.

*Foreseeable Future*

Mother primarily argues the district court's finding of unfitness was not supported by clear and convincing evidence that her conduct or condition was unlikely to change in the foreseeable future. She contends since foreseeable future is not clearly defined in Kansas law, the evidence presented at trial was not sufficient to establish she could not have become fit within the foreseeable future given that she had been making progress.

14

The term foreseeable future is measured from the child's perspective and takes into account a child's perception of time, which differs from that of an adult. *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009). A court may predict a parent's future unfitness based on his or her past history. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982).

Mother first argues that no brightline rule exists for "foreseeable future" in Kansas law. Mother points out Brown testified Mother would need to be stable for 6 months before N.P. could be reintegrated. Mother suggests, however, there is no significance to the 6-month time period and there is no real reason the time period could not have been as short as a few months. Brown's testimony was not, however, the only evidence presented at trial on this issue nor was testimony limited to the 6-month time period. Jantz testified Mother would need to be in a stable home for 3 to 6 months to demonstrate longer term stability. Mother herself testified that she would need to be in a house for 6 months to be considered stable. Furthermore, the district court repeatedly referenced Jantz' 3- to 6-month time frame in its ruling, which it expressly found was too long for N.P. to wait to gain permanency.

Additionally, this court has previously found that requiring a child to wait in excess of 2 years for reintegration to begin was too long, though this was just one of several factors weighed in determining whether to terminate parental rights. See *In re C.C.*, 29 Kan. App. 2d 950, 954, 34 P.3d 462 (2001); *In re Z.J.*, No. 113,093, 2015 WL 5926980, at *13-14 (Kan. App. 2015) (unpublished opinion). In this case, N.P. was removed from Father's home at age 2 and had already spent 2 years in DCF custody at the time of the termination hearing. According to witnesses, it would be at least another few months before the possibility of reintegration with Mother became a reality.

Second, Mother argues she made tremendous progress over the course of the case and only her failure to secure housing prevented her from achieving reintegration. Mother did complete many of the tasks assigned to her over the 2 years of the case. She completed all her court orders, was successfully discharged from individual therapy, and regularly attended family therapy and her individual visits with N.P. During this same time, however, Mother also displayed an inability to maintain stable housing and employment. She had at least four jobs and five residences during the pendency of the case. Her longest period of stable housing was only 2 months, and she had been unemployed for 10 months. She also frequently chose to live with others who could provide her support.

Based on Mother's history of unstable housing, sporadic employment, and codependency, the district court could conclude that it was highly probable that Mother would remain unfit in the foreseeable future as determined by the length of time N.P. had already been in DCF custody.

Mother also rejects the district court's finding that terminating her rights was in N.P.'s best interests under K.S.A. 2014 Supp. 38-2269(g)(1).

The proper standard of review for the best interests of the child determination in a termination hearing is abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014); *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255, *rev. denied* (October 7, 2010). An abuse of discretion occurs when the district court bases its decision on an error of fact or law or when no reasonable person would agree with the decision of the district court. *Northern Natural Gas Co. v. ONEOK Field Services, Co.*, 296 Kan. 906, 935, 296 P.3d 1106, *cert. denied* 134 S. Ct. 162 (2013). When making the best interests determination, the district court must primarily consider the physical, mental, and emotional needs of the child. K.S.A. 2014 Supp. 38-2269(g)(1). If

16

termination of parental rights would best serve these needs, then the court must terminate those rights. K.S.A. 2014 Supp. 38-2269(g)(1).

In her argument, Mother identifies two standards of review. First, she claims there was not clear and convincing evidence that termination of her parental rights was in N.P. best interests. Later, she argues the district court abused its discretion in finding it was in N.P.'s best interests to terminate Mother's parental rights. The proper standard of review on this second issue is abuse of discretion as clarified in *In re R.S.*, and we will analyze the district court's determination accordingly.

Mother argues that because she was closely bonded to and loved N.P., N.P. might be traumatized by the termination of her parental rights. Thus, the court must weigh the need for permanency against the possible trauma to N.P. caused by the termination of Mother's rights. In support of her argument, she cites *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010):

> "[T]he court must weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives. In making such a determination, we believe the court must consider the nature and strength of the relationships between children and parent and the trauma that may be caused to the children by termination, weighing these considerations against a further delay in permanency for the children."

While the district court did not directly address any possible trauma to N.P. that could be caused by terminating Mother's parental rights, it did consider the nature and strength of their relationship by acknowledging that Mother clearly loved N.P. and the two had a strong bond. Ultimately, though, the court found that this was insufficient to overcome the other factors at issue in the case. The court noted that N.P. was making great progress in her current situation but required continued consistency and stability. The

17

case had been ongoing for 24 months, and Mother was still struggling in all areas and appeared to be unable to provide stability in the foreseeable future.

Furthermore, this court has acknowledged that a parent who loves his or her child and wants to "do the right thing" may still be found unfit because courts must judge parents by actions and not intentions. *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008). While Mother has demonstrated she loves N.P. and she has made efforts towards reintegrating N.P. into her home, she was still unable to maintain stable income and housing even after a 2-year period. Because the court must assess Mother by these actions rather than her bond with N.P., Mother may still be found unfit and terminating her parental rights may still be in the best interests of N.P.

A reasonable person could agree that N.P.'s need for permanency and the harm that could be caused by its further delay outweighed the risk of any trauma caused by severing her relationship with Mother. Thus, the district court did not abuse its discretion in finding that terminating Mother's parental rights was in N.P.'s best interests.

Affirmed